675 F.2d 1135
 EL PASO NATURAL GAS COMPANY, Plaintiff-Appellant, Cross-Appellee,
v.
WESTERN BUILDING ASSOCIATES, a partnership; R. L. Kysar; W.
M. Gallaway; B. J. Baggett; and Perkins & Co., a
New Mexico corporation,
Defendants-Appellees, Cross-Appellants.
 Nos. 80-1001, 80-1002.
 United States Court of Appeals,
 Tenth Circuit.
April 21, 1982.
 
 John B. Pound of Montgomery, Andrews & Hannahs, Santa Fe, N. M., for plaintiff-appellant/cross-appellee.
 John R. Cooney, Albuquerque, N. M. (Mark B. Thompson, III, Albuquerque, N. M. with him on the briefs), of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., for defendants-appellees/cross-appellants.
 Before BARRETT and LOGAN, Circuit Judges, and CHILSON, District Judge*.
 LOGAN, Circuit Judge.
 
 
 1
 In this diversity action both plaintiff El Paso Natural Gas Company ("El Paso") and the defendants, Western Building Associates and related parties (collectively "Western"), appeal the trial court's decision, which granted El Paso specific performance of its contract to purchase property owned by Western, but which also granted to Western various adjustments in the sale price. Western challenges the grant of specific performance and El Paso seeks to avoid the adjustments.
 
 
 2
 In September 1969, Western purchased an 8.08 acre tract in Farmington, New Mexico, containing the four-story Petroleum Plaza Building. At that time El Paso occupied all of the third and half of the fourth floors. Western and El Paso then began negotiating a long-term lease, and in December they signed a five-year lease to begin January 1, 1970, with El Paso having the right to renew the lease for two additional five-year periods. This case focuses on Section VI of the lease, which gives El Paso an option to purchase the building at the end of the first five-year period:
 
 
 3
 "VI. OPTION TO PURCHASE
 
 
 4
 Section 6.1 Lessor hereby grants unto Lessee the exclusive right and option to purchase all right, title and interest in and to Petroleum Club Plaza Building comprising 8.08 acres of land, more or less, and all appurtenances, facilities, equipment and hereditaments thereunto belonging subject to attorney's title opinion showing good and merchantable fee simple title to the premises in Lessor for a total consideration of $850,000.00 in cash; provided, however, this option shall be effective during a one hundred twenty (120) day period following the expiration of the initial term of this Lease. In the event Lessee exercises this option to purchase, this Lease shall terminate as of the date title vests in Lessee."In October 1974, El Paso renewed the lease for a second five-year period. On February 27, 1975, it gave Western written notice that it was exercising the purchase option. Western responded on March 31, 1975, stating that it would not convey the property because it believed that El Paso, by renewing the lease, had waived its right to exercise the purchase option. El Paso then brought this action for specific performance.
 
 
 5
 The case was tried to the court, sitting without a jury. The court referred to a special master several issues such as the value of improvements Western had made to the building during the lease period, the amount of rents and profits that had accrued to Western after El Paso had attempted to exercise the purchase option, and the identity of the fixtures to be conveyed with the building. In granting specific performance, the court adopted the special master's findings, which included the award to Western of 81/2% interest from March 1, 1975, the approximate date El Paso stated it was exercising the option. However, the court ordered Western to convey only the building, the parking lot, and a small surrounding strip of land-less than four of the 8.08 acres. The court concluded as a matter of law that the option did not include the entire 8.08 acre tract. El Paso appealed this finding, and we reversed, holding that the lease agreement did not support the trial court's interpretation. El Paso Natural Gas Co. v. Western Bldg. Assoc., 599 F.2d 927, 929 (10th Cir. 1979). In that appeal El Paso also challenged the adjustments the court had made in the purchase price, but we reasoned that the court's resolution of those issues may have been tied to its conclusion that Western need convey only approximately four acres. Therefore, rather than determining the propriety of those adjustments or addressing the contentions Western raised in its cross-appeal, we remanded the entire case for further consideration.
 
 
 6
 After rehearing the trial court ordered Western to convey the entire 8.08 acre tract. On this second appeal Western renews its contention that El Paso should be denied the remedy of specific performance; alternatively, that the trial court should have limited specific performance, as it initially did, to the building, the parking lot, and the area immediately surrounding the building. El Paso's cross-appeal questions two adjustments, claiming, first, that it should not have to pay the cost of improvements Western had made in the building since Western had recouped its costs through additional rents generated by the improvements; and, second, that Western was not entitled to 81/2% interest on the purchase price, and instead was entitled either to no interest because Western had wrongfully refused to convey, or interest at New Mexico's statutory rate of 6%.[1] Western also argues the trial court acted improperly in cancelling, as a fraud and a sham, a fifty-year lease on approximately four of the 8.08 acres that Western had entered into on December 20, 1974, with a company controlled by one of Western's partners.
 
 
 7
 * Specific Performance
 
 
 8
 Western contends that the trial court should not have granted specific performance to El Paso because (1) on remand the trial court found that the parties did not intend the option provision to be exercised unless Western dissolved, became bankrupt, or mismanaged the building, none of which occurred; (2) in purporting to exercise the option, El Paso improperly added new terms to it; (3) El Paso never tendered the $850,000 purchase price within the option period; and (4) the parties had not foreseen the tremendous increase in the building's value that occurred between the lease date and the option date. Additionally, Western contends that if specific performance was proper, it should have been limited, as the trial court initially did, to the building, the parking lot, and the land within a reasonable perimeter, less than four acres, rather than the entire 8.08 acres, for the reason that "Building comprising 8.08 acres" is an ambiguous description to be construed against the draftsman, El Paso.
 
 
 9
 According to Western, George Vance, the building manager of the El Paso subsidiary responsible for supervising El Paso's office facilities, told Western partners on several occasions that El Paso would never exercise the purchase option unless Western dissolved, became bankrupt, or failed to provide adequate service. Western alleges that it relied on Vance's representations when it made improvements to the building, and that the representations both modified the purchase option clause and make it inequitable to grant specific performance.
 
 
 10
 In its first opinion the trial court found that Vance never made any such representations and that El Paso had an unconditional right to exercise the purchase option. In its opinion after the rehearing on remand, the trial court incorporated the earlier findings unless they conflicted with its new findings. While Vance's representations were not an issue on remand, Western argues the trial court's findings in the second opinion are inconsistent on this issue with those in the earlier opinion and that the trial court has now found that the option provision was not to be exercised unless one of three conditions occurred: Western's dissolution, bankruptcy, or mismanagement. In support Western points to the court's new finding of fact no. 18, which states that the "original purpose (of the option clause) was to protect the lessee, EPNG, from the lessor's mismanagement of the property or failure to maintain the property not leased to the lessee, EPNG." Additionally, Western points to the court's statement in its memorandum opinion that "notwithstanding (the option clause's) original purpose" El Paso exercised the option because land values in Farmington increased dramatically during the lease period.
 
 
 11
 However, Western confuses the purpose of the option clause with conditions placed on its exercise. El Paso may have sought the option clause for the reasons stated by Western-fear of dissolution, bankruptcy, or mismanagement-but it did not limit exercise of the option to occurrence of one of those three conditions. The court's finding of a limited purpose for the option clause is consistent with its finding that El Paso had an unconditional right to exercise the option.[2]
 
 
 12
 Western's second argument against specific performance is that El Paso did not properly exercise the option and that the trial court was wrong in its conclusion to the contrary. For an option to be exercised, New Mexico requires an "unequivocal and unqualified" expression of intention to do so. See, e.g., Skarda v. Davis, 83 N.M. 342, 491 P.2d 1153, 1157 (1971). Western notes that El Paso's letter of February 27, 1975 purports to exercise the option, but says El Paso will "tender its consideration upon Western Building's tender of an attorney's title opinion."[3] The option clause states that El Paso has the right to purchase the property "subject to attorney's title opinion showing good and merchantable fee simple title," but the option does not specify who is to pay for the title opinion. Western argues that requiring Western to tender the title opinion was only a qualified acceptance of the purchase option. However, even if we were to agree, the trial court found that three weeks later, which was still within the time permitted for exercise of the option, El Paso representatives agreed that El Paso would pay all closing costs in the transaction, including the cost of the attorney's title opinion. That cured any defect in El Paso's acceptance.
 
 
 13
 Western makes a frivolous objection to the manner in which El Paso exercised the purchase option at a March meeting in Farmington. Western says that El Paso added new terms to the option when: (1) it asked Western to sign a memorandum of sale; (2) the memorandum provided that closing would be held at a particular title company in Farmington; and (3) the memorandum provided that the sale and closing would be "as is customarily consummated in New Mexico real property transactions." Western has never contended that it preferred a different time or place of closing-it objects to El Paso's naming of a time and place of closing.
 
 
 14
 The option clause contained the contract's essential terms-subject matter and price-leaving the parties to agree at a later date on the details of closing the sale. See, e.g., Koedding v. Slaughter, 634 F.2d 1095, 1097 (8th Cir. 1980); Reis v. Sparks, 402 F.Supp. 1393 (D.Md.1975), aff'd, 547 F.2d 236 (4th Cir. 1976). Because the contract was silent on such details as the date and place of closing, Western cannot complain that El Paso improperly exercised its option when, in a reasonable manner, it requested agreement on those details. The trial court correctly found that El Paso's memorandum of sale did not vary or alter the terms of the purchase option.
 
 
 15
 Western also contends that El Paso improperly exercised the option clause because it failed to tender the purchase price of $850,000. However, the option clause does not state whether tender was required. The general rule is that when the option contract is silent, it may be exercised merely by giving notice. See, e.g., Loose v. Brubacher, 219 Kan. 727, 732, 549 P.2d 991, 996 (1976). When the option holder gives notice, a bilateral contract is formed with one party having the duty to convey the property and the other the duty to pay. See 1A A. Corbin, Contracts § 264, at 514-15 (1963). The trial court specifically found that the purchase option did not require tender. Even if tender had been required, the trial court found El Paso could have obtained a draft for $850,000 within 24 hours, but "it was reasonably apparent to El Paso Natural Gas Company that such a tender would not have been accepted," and therefore a pro forma tender was unnecessary. See Ford v. Lord, 99 Idaho 580, 586 P.2d 270, 274 (1978). These findings were not clearly erroneous.
 
 
 16
 Western asserts that during the five-year option period, property values in Farmington skyrocketed so much that at the time El Paso sought to exercise the option, the building and adjoining land were worth at least $1,200,000; therefore, it argues, the doctrines of commercial frustration and financial hardship should preclude granting specific performance of the sale for a price that, after equitable adjustments, totalled $986,865.11. However, inadequacy of consideration, in the sense that the seller made a bad bargain, is not by itself a sufficient reason to disallow specific performance. See, e.g., Wittick v. Miles, 274 Or. 1, 545 P.2d 121, 125 (1976). The court found that sale at that price would neither commercially frustrate Western nor result in economic hardship. Because Western's purchase price in 1969 was only $393,000, a 1975 option price of $850,000, increased by the value of the improvements Western had made, cannot plausibly be termed "economic hardship."[4]
 
 
 17
 Western next contends that the trial court should have denied specific performance because the subject matter of the option clause was uncurably ambiguous; alternatively, if specific performance was proper, it should have been limited to the building, the parking lot, and a small strip of land around the building, rather than the entire 8.08 acre parcel, for the reason that the option clause was ambiguous and should be construed against the draftsman, El Paso. On remand the trial court found: that the option agreement was ambiguous as to the property included, that the parties intended the option to cover the entire 8.08 acres, and that specific performance of the option for the entire 8.08 acres would be fair and equitable.
 
 
 18
 The trial court determined that the option clause's reference to the right to purchase the "Petroleum Club Plaza Building comprising 8.08 acres of land" could be interpreted as a right to purchase only the building or the entire 8.08 acre parcel. In its argument that the ambiguity is uncurable, Western relies on New Mexico's general rule that when land is being conveyed by deed, the deed itself must adequately identify the land, or if a court is to consider extrinsic evidence, then the deed must identify the source of the extrinsic evidence. See, e.g., Komadina v. Edmondson, 81 N.M. 467, 468 P.2d 632, 634 (1970). However, New Mexico does not so severely limit the admissibility of extrinsic evidence. See Sternloff v. Hughes, 91 N.M. 604, 577 P.2d 1250, 1252 (1978) (deed's indefinite or uncertain description of land can be clarified by parties' subsequent acts). More importantly, the trial court was interpreting a contract, not a deed. Therefore, after determining that the contract was ambiguous, the trial court properly concluded that the terms of the contract were questions of fact on which extrinsic evidence was admissible. See, e.g., Young v. Thomas, 93 N.M. 677, 604 P.2d 370, 372 (1979). Unless the trial court was clearly erroneous in its resolution of the factual questions, we may not overturn it.
 
 
 19
 El Paso's employee George Vance testified that he and Western partner Raymond Kysar, Jr., agreed that all 8.08 acres were included. The trial court accepted Vance's testimony that when discussing the land to be included in the option, he and Kysar walked the boundaries of the 8.08 acre property. The record also indicates that when one Western partner sold his interest to the others, he described the partnership's holding simply as the Petroleum Plaza Building. Further, after El Paso informed Western that it was exercising the option, Western told El Paso that it believed El Paso had no option right and that in reliance thereon Western had leased four of the 8.08 acres to the Perkins Company. At the March 1975 meeting in Farmington, Kysar sought reassurance from El Paso that if El Paso purchased the property, El Paso would honor the outstanding leases, including the Perkins lease. These actions suggest Western believed the option clause encompassed not only the building but the remainder of the 8.08 acre parcel. The rule that ambiguous phrases are construed against the draftsman applies only when the court is unable to determine the parties' intent, which it was able to do here. We cannot say the trial court was clearly erroneous in finding that the parties intended the option to include the entire 8.08 acre parcel.
 
 II
 Adjustments in the Purchase Price
 
 20
 El Paso's cross-appeal contends that the trial court erred in adding $136,865.11 to the purchase price in order to compensate Western for the expenses of constructing offices in the building's basement and first floor, which were unfinished when Western purchased the building and entered into the lease with El Paso. According to El Paso, Western is not entitled to reimbursement because the rents Western received from these additional offices exceeded the costs of constructing them.
 
 
 21
 Specific performance rests in the discretion of the trial court, to be exercised in accordance with general principles of equity jurisprudence. A party seeking equitable relief must be prepared to give in return that which is just and equitable. See, e.g., Cascade Timber Co. v. Northern Pac. Ry., 28 Wash.2d 684, 184 P.2d 90, 104 (1947). Subject to the court's equitable discretion, a defaulting seller compelled to specifically perform is generally permitted an increase in the purchase price for improvements made after entering the contract, at least when the seller had reason to believe sale was not going to occur. See, e.g., Coppom v. Humphreys, 171 Colo. 410, 467 P.2d 816, 819 (1970); Calbreath v. Borchert, 248 Ia. 491, 81 N.W.2d 433, 437 (1957). El Paso contends that an exception to the general rule prohibits reimbursing the seller if the seller has already recouped the cost of the improvements through rents and profits generated by the improvements. The instant case is unusual in that it involves an option to purchase a building, given to a lessee of space therein at a time when major portions of the building have been left unfinished. We need not decide whether the recoupment exception applies when the improvements are made to complete a building and the cost is substantial, here more than one-third of the price the seller paid for the entire structure and surrounding land just three months before entering into the option agreement. We find that while the record shows all rents derived from the building exceeded the cost of constructing the additional offices, it does not show whether the cost was exceeded by rents derived from those offices alone.
 
 
 22
 El Paso claims that while testifying, Western's partner Raymond Kysar, Jr., acknowledged three times that the rental income generated by the improvements exceeded the cost of the improvements. But the record is ambiguous at best. On the first occasion Kysar said only that operating the building had been profitable, the rentals charged had more than offset Western's expenses in remodeling, and the income received from tenants occupying the completed offices had helped Western to make mortgage payments. R. V, 467-68. Later Kysar said that the "total rental income" at least equalled the cost of the improvements. R. V, 509. Still later Kysar repeated that the "total income" Western received offset its costs of completing the building. R. V, 523. We cannot say that the record shows Western's income from the improvements exceeded its costs. Therefore, the trial court did not abuse its discretion in awarding Western the costs of completing the building.
 
 
 23
 El Paso also challenges the trial court's award to Western of 81/2% interest on the amount of the purchase price (increased by Western's costs of completing the building), from the date Western should have transferred the building to El Paso until the date El Paso paid the sum to Western. The court made this adjustment at the same time it ordered payment to El Paso of the net rents and profits Western derived from operating the building during that time. The court intended to place El Paso and Western in the positions they would have been in had the sale taken place within a reasonable time of the option's exercise: as building owner, El Paso would have received the rents and profits, and as seller, Western would have had use of the purchase money. See, e.g., Ellis v. Mihelis, 60 Cal.2d 206, 32 Cal.Rptr. 415, 384 P.2d 7, 15 (1963).
 
 
 24
 According to El Paso, the trial court should have limited the interest rate to 6%, the rate set by New Mexico for money due "by contract" or "on judgments."[5] N.M.Stat.Ann. § 56-8-3. Instead, the trial court approved the special master's finding that a rate of 81/2% was equitable because it was the mortgage rate prevailing in New Mexico at that time. We think the New Mexico statute clearly inapplicable since the trial court, sitting in equity, was not awarding money due on a contract; and of course there was no money due "on a judgment" until the court entered its judgment. The trial court did not abuse its discretion in awarding interest at an 81/2% rate as necessary to adjust the equities between the parties in this specific performance action.
 
 III
 Cancellation of the Perkins Lease
 
 25
 In December 1974 Western leased approximately four of the 8.08 acres to Perkins & Co., Inc., a construction company 60% owned by Western partner Kysar. The lease was to run for fifty years, with rent of $100 per month, renewable for an additional twenty-five years at a rent of $200 per month. According to Kysar, Perkins intended to construct an apartment complex on the property and the long-term lease was necessary to qualify for FHA financing. Kysar acknowledged he initiated the lease and represented both sides in the negotiation; though after signing it for Western he presented it to his partner W. M. Gallaway, who also signed it, and who testified he believed the rent was fair. Western claims the trial court erred in cancelling the lease on the ground it was a fraud and a sham intended to dissuade El Paso from exercising the purchase option.
 
 
 26
 Western contends the trial court was without authority to cancel the lease. However, in a state court action El Paso brought against Kysar seeking cancellation of a lease Western entered into with Kysar's insurance agency, the New Mexico Court of Appeals held that if El Paso was able to show the lease was entered into as a result of fraudulent conduct, El Paso would be entitled to rescission. El Paso Natural Gas Co. v. Kysar Ins. Agency, Inc., 93 N.M. 732, 605 P.2d 240, 243 (Ct.App.1979). We conclude that the trial court had authority to cancel this New Mexico lease if the evidence supports its finding that the lease was entered into for the purpose of defrauding a subsequent purchaser of the leased property.
 
 
 27
 Western contends that the evidence failed to show "clearly and convincingly" that the lease was a sham, as New Mexico requires for a finding of fraud. See, e.g., Hockett v. Winks, 82 N.M. 597, 485 P.2d 353, 354 (1971). According to Kysar's testimony, 10% of the property's market value is a fair rental for a ground lease; because the property had a book value of only $1,000 per acre, an annual rent of $1,200 was fair for the four acres. However, the trial court, terming the consideration "grossly inadequate," found that the four acres were worth at least $10,000 per acre. Additionally, the trial court accepted the testimony of El Paso's expert witness Jay Weems that leases for such long terms should require the tenant to pay increases in property taxes since such increases are likely, especially if the tenant erects improvements on the property, and the lease should provide for cost of living increases in the rent to protect the lessor from the effects of inflation.[6] Western was aware of the desirability of such clauses; the July 1973 amendment to the El Paso-Western lease provided that in the event El Paso renewed the lease for a second or third five-year period, the rent would be adjusted to reflect increases in real property taxes and adjusted for changes in the consumer price index. Further, when Kysar sought the lease, he knew the property was worth more than $1,000 per acre and that El Paso was interested in exercising the purchase option. Finally, Western never collected any rent from Perkins, allowing it to forego payment on the ground that litigation was threatened, which suggests a non-arms length arrangement. Because of all of the factors recited above, we conclude that the trial court had "clear and convincing evidence" that Western entered into the lease in an effort to defraud El Paso or at least to dissuade, impermissibly, El Paso from exercising the purchase option.
 
 
 28
 We sustain the trial court's grant of specific performance, its equitable adjustments in the purchase price, and its cancellation of the Perkins lease.
 
 
 29
 AFFIRMED.
 
 
 
 *
 Honorable Olin Hatfield Chilson, United States District Judge for the District of Colorado, sitting by designation
 
 
 [1]
 In its briefs El Paso also contended that its entitlement to "appurtenances, facilities, equipment and hereditaments" included more than the "fixtures" itemized by the special master. However, at oral argument El Paso dropped this contention
 
 
 [2]
 Nothing in the record suggests the trial court intended a change in its findings. During proceedings following remand the court stated it was not going to rehear the issue of specific performance. Additionally, in its opinion after the hearing on remand the court found that the parties intended the option clause to be fully exercisable in 1975. The court then ordered specific performance of the entire 8.08 acres, an action it would not have taken if it believed the parties had placed conditions on exercising the option clause
 
 
 [3]
 After stating that El Paso is exercising its option, El Paso's letter provides that "EPNG will tender its consideration upon Western's tender of an attorney's title opinion according to the terms of the aforesaid § 6.1 (of the lease). Counsel for EPNG will contact you within the near future to arrange a closing."
 
 
 [4]
 Western also maintains that our prior remand required the trial court, in redetermining whether the option addressed the entire 8.08 acre parcel, to reconsider its adjustment of the equities. Western asks that we remand for that reconsideration, hoping that upon reconsideration the trial court will deny specific performance. However, while in our prior opinion we noted that the trial court's erroneous legal conclusion might "have a significant bearing on the other related issues," El Paso Natural Gas, 599 F.2d at 929, we did not require it to reconsider its prior adjustment of the equities. Further, we are convinced from reading the record that in deciding that the purchase option included the entire 8.08 acres, the trial court considered the equities and remained satisfied with its order of specific performance
 
 
 [5]
 El Paso also argued that the trial court erred in awarding any interest since it implicitly found Western had been "at fault" in not conveying the property. However, El Paso also conceded that this argument is illfounded if we uphold Western's right to recover the cost of the improvements it had made, as we have
 
 
 [6]
 Western objected to Weems's testimony on the ground that he had not been shown to be an expert in long-term leases in the Farmington area. Whether testimony should be admitted as the opinion of an expert is subject to the trial court's discretion. See, e.g., Scholz Homes, Inc. v. Wallace, 590 F.2d 860, 863 (10th Cir. 1979). Weems had been shown to be an expert in real estate appraisal and had testified as to the value of the 8.08 acre parcel. He was familiar with long-term leases in the El Paso area. In view of the common-sense nature of Weems's testimony and Western's opportunity to thoroughly cross-examine him, the trial court did not abuse its discretion in allowing Weems to testify as to terms a lessor should include in a long-term lease